[No. G021739. Fourth Dist., Div. Three. Nov. 24, 1999.]

COUNTY OF ORANGE, Plaintiff and Respondent, v.
CARL D., Defendant and Appellant.

## COUNSEL

Elder & Manning and David P. Elder for Defendant and Appellant.

Michael R. Capizzi and Anthony Rackauckas, District Attorneys, and Walter D. Germond, Deputy District Attorney, for Plaintiff and Respondent.

## OPINION

**CROSBY, Acting P. J.**—A father spent 11 years fruitlessly searching for his children, who were abducted and concealed by the mother, a drug abuser. The children ultimately ended up in foster care, receiving public assistance benefits. But the same public entity that said the father could not be located for purposes of the dependency proceedings managed to track him down to garnish his wages for benefits paid while the children were on welfare. Regrettably, it was more interested in pursuing this father as a deadbeat dad than in helping him to function as a real one. The county is estopped by its own affirmative misrepresentations from recouping public assistance payments that need never have been made at all.

I

Plaintiff Carl D., a serviceman in the Navy, married Denise D. in 1984. They already were the parents of three girls, Jennifer, born in March 1982, and twins, Carla and Christina, born in February 1983. Upon his discharge Carl and his family moved to North Carolina, where he began working for a plumbing company in May 1984. A few months later, Carl returned home from work to find Denise and the girls had vanished. The spouses had argued that morning regarding Denise's plan to buy recreational drugs.

For the next 11 years, Carl futilely hunted for his family. He said neither local law enforcement nor local social welfare agencies were interested in helping him. He searched through telephone books and utility records and attempted to contact Denise's family, but to no avail.

Although he remained legally married to Denise, Carl fathered a son with another woman in 1986, ultimately gaining legal and physical custody. In 1990, he moved to Sonoma County, where his father lived.

Unknown to Carl, Denise and the three girls first moved to Arizona, where she began a new romantic relationship. Around 1986, they came to California. In March 1990, dependency proceedings were initiated in Los Angeles County based on allegations that Denise had physically abused the children. She informed social workers she did not know Carl's birth date, Social Security number, or the location of any of his family or friends, and that she had neither seen nor heard from him since leaving North Carolina.

In February 1992, Denise and her boyfriend were arrested in Newport Beach for commercial burglary. The children were nearby in the car. Denise, who was under the influence of methamphetamines, was incarcerated. A supplemental petition was sustained, and the children were placed in foster care. In March 1993, dependency jurisdiction was transferred to Orange County.

In June 1993, the children began receiving welfare assistance, and the Orange County Social Services Agency (SSA) made a referral to the district attorney's child support unit. Within a month the district attorney requested help from the California Parent Locator Service to find Carl. In August 1993, the Department of Motor Vehicles reported he had a mailbox in Sonoma.

Despite this information, on October 20, 1993, SSA filed a supplemental court report in conjunction with the juvenile court's periodic review, stating, "CARL [D.] (FATHER) [¶] WHEREABOUTS UNKNOWN." The report further indicated, "There was no possibility to pursue the subject further. Currently, there is no information on Carl [D.] other than his name and that he was last seen seven years ago in North Carolina." Based on this assertion, the court did not notify Carl of the periodic review or its continuing supervision of the children in foster care.

In March 1994, the postal service informed the district attorney of the street address for Carl's residence. A month later SSA submitted a supplemental court report in conjunction with the periodic review hearing on April 27, 1994. The report again asserted as to Carl: "Whereabouts unknown." The absent parent search activity repeated SSA's earlier conclusion that "[t]here was no possibility to pursue the subject further." SSA filed additional reports in October 1994 and April 1995 making the same boilerplate assertions regarding Carl's unknown whereabouts and its inability to obtain further information.

On July 7, 1995, some 16 months after acquiring knowledge of Carl's address, the district attorney filed the instant petition to declare Carl the

father of the 3 children and for reimbursement of public assistance expended since June 1993. (Welf. & Inst. Code, §§ 11350, 11350.1, 11475.1.) Carl asserts this was the first he learned of the whereabouts of Denise and the children: "Prior to July 31, 1995, I had never received notice that a public agency had custody of my children. . . . Prior to July 31, 1995, I had never been notified that a public agency was providing support or care for my children."

On August 28, 1995, Carl contacted SSA and told the social worker "he has been searching for the three girls for quite some time and is interested in doing what is necessary to reunify with the three girls." Visitations were arranged, and SSA scheduled a home study and evaluation of Carl's Sonoma County residence. No interim changes were made in the children's custody or status, and they continued to receive welfare benefits.

Carla and Christina were reunited with Carl in November 1995, and Jennifer moved in with him a month later to what SSA reported was a "nurturing, caring home atmosphere." He divorced Denise in January 1996 and remarried. Dependency jurisdiction was terminated on January 27, 1997.

The instant action for reimbursement was tried on a twelve-page declaration from Carl, a two-page declaration from his attorney and a two-page declaration from a deputy district attorney. There was no live testimony.[1]

The court issued a lengthy statement of decision, in which it found that Carl was a "nonwilling 'absent' parent." Although the court noted the district attorney's office offered no explanation for its failure to file the instant action in March 1994 "when the Family Support Division of the District Attorney's Office had secured a presumably valid address for Respondent," it speculated the delay could have been caused by "bureaucratic overload." The judge refused to consider any issues regarding the county's "wrongfulness" because Carl failed to present any controlling authority that the county had a duty to locate him.

The court concluded, "It is clear that the California [L]egislature desires that the taxpayers be reimbursed for expended aid. . . . [T]here is a primary duty to support on the parents, and not the taxpayers . . . ." Applying the statewide uniform guidelines for child support, the court ordered Carl to pay

---

[1]Carl attached as an exhibit below one of the above quoted absent father declarations, which was filed by SSA in In re Jennifer D., In re Carla D. and In re Christina D. (Super. Ct. Orange County, Nos. J427480, J427481, J427482). Pursuant to Evidence Code sections 452, subdivision (d)(1) and 459, we take judicial notice of the entire court file in these cases.

the county a total payment of $15,975, covering the period from March 1994 until mid-December 1995. Carl has appealed the order, contending the county intended to obstruct his reunification with the children and willfully concealed his children from him "so that the COUNTY could charge him money for keeping his children."[2]

## II

The trial court's ruling was correct as far as it went. Carl's children were secreted by his wife, not the county, which is entitled to reimbursement for benefits paid while he did not support them. This issue has been resolved by the Supreme Court in *In re Marriage of Comer* (1996) 14 Cal.4th 504 [59 Cal.Rptr.2d 155, 927 P.2d 265].

But there is a significant difference between this case and *Comer*. No dependency proceedings were at issue in *Comer*. Here, in contrast, the county had a due process obligation to notify Carl of the pending dependency proceedings. Despite this, its absent parent search declaration misrepresented information within the county's actual possession regarding Carl's

---

[2]Carl's appeal challenges the county's right to a recoupment, but not the amount awarded by the court. We do note, however, that the county was awarded a total of $15,975 even though it only expended $9,267 during the period the court found reimbursable. Relying upon Welfare and Institutions Code section 11350, subdivision (a)(2), the court explained, "The liability of Respondent is not limited to $9,267 but is to be limited to what he *should have paid* in child support for that period."

We question the court's calculations under the circumstances of this case. There are two reasons why Welfare and Institutions Code section 11350 allows counties to take in more than they paid out: to penalize the noncustodial shirker and to give additional financial support to the children to cover unmet needs while they were receiving public assistance. (*County of Orange* v. *Dabbs* (1994) 29 Cal.App.4th 999, 1005 [35 Cal.Rptr.2d 79].) That is why section 11350 expressly provides that "any such amount in excess of the aid paid to the family shall not be retained by the county, but disbursed to the family."

These reasons do not seem to apply here. Carl never evaded his responsibilities, is now the custodial parent, and the family now consists of Carl and the three girls. At oral argument the county explained its own internal policy of declining to accept excess funds in foster care, boarding home institution or "non-needy" caretaker cases: "[SSA] . . . refuses to accept any further money [beyond that actually expended] from [the district attorney], and in which case, we close our case and don't collect any more." In light of our holding, we do not reach this issue, but we urge trial courts to consider the identity of the ultimate beneficiary when exercising their discretion "to find special circumstances based upon the facts before it which make application of the guideline formula unjust." (*City and County of San Francisco* v. *Funches* (1999) 75 Cal.App.4th 243, 246 [89 Cal.Rptr.2d 49] [trial court properly factored into reimbursement formula fact that child spent two days in father's care as well as his present efforts to reunify with her]; see also *Clark* v. *Superior Court* (1998) 62 Cal.App.4th 576, 584, fn. 5 [73 Cal.Rptr.2d 53] ["It goes without saying that court hearing officers are by no means bound to make any order based on obviously incorrect data. Their duty as hearing officers is to ascertain the *truth* in welfare reimbursement cases—they do not do their jobs when they merely rubber-stamp the output from a deputy district attorney's computer."].)

*known* whereabouts. All elements for an estoppel against the government are present, and its application is fully consistent with the public policy principles espoused in *Comer.*

## A

One of the least controversial aspects of the welfare system is the requirement that absent parents (generally absent fathers) reimburse governments for welfare costs paid to the custodial parent (generally the mother) during the time the children were abandoned or deserted. (Welf. & Inst. Code, § 11350; *Clark* v. *Superior Court, supra,* 62 Cal.App.4th at pp. 578, 580; *City and County of San Francisco* v. *Funches, supra,* 75 Cal.App.4th 243.) There is a three-year statute of limitations. (*City and County of San Francisco* v. *Thompson* (1985) 172 Cal.App.3d 652, 659 [218 Cal.Rptr. 445].)

While this obligation has its genesis in the moral reprehension of deadbeat parents, its application is much broader. Liability is not necessarily based upon fault or wrongdoing; absent parents may be obliged to pay even where their former or current spouse deliberately concealed the child in violation of a court order. (*In re Marriage of Comer, supra,* 14 Cal.4th 504.) The rationale, "quite plainly, was to recoup welfare costs from the absent parents of children being given public assistance." (*Clark* v. *Superior Court, supra,* 62 Cal.App.4th at p. 579.)

In *Comer* a divorced father was deliberately kept away from his children for more than seven years by the mother, who had remarried, hiding her new identity and location. Like Carl, the father could not afford to hire a private investigator. Nonetheless, the Supreme Court held the county was entitled to reimbursement under the "responsible relative statutes," even though the father never knew where the children were or that they were receiving AFDC (Aid to Families With Dependent Children) benefits. The court explained these statutes were modern descendants of the Elizabethan "Poor Law" " 'to protect the local, state and federal · share of aid granted to recipients.' " (*In re Marriage of Comer, supra,* 14 Cal.4th at p. 521.)

Even though he now has custody of the children, Carl was a noncustodial parent when the public assistance benefits were incurred. (Welf. & Inst. Code, § 11350.) ██ Under Welfare and Institutions Code section 11350, the condition that triggers the noncustodial parent's reimbursement obligation is the "separation or desertion of a parent or parents from a child or children which results in aid under this chapter being granted to that family

. . . ."[3] Thus, even parents having a legal right to custody still may be labeled noncustodial parents if their absence has contributed to the need for public assistance. (*County of Yolo* v. *Worrell* (1989) 208 Cal.App.3d 471, 477 [256 Cal.Rptr. 259].)

Carl argues he should have no reimbursement responsibilities when he had "no reason to believe his children were being supported by any person or entity other than Denise [D.]" And since he now is the custodial parent, his ability to provide for their upkeep (a duty he has happily assumed) will be impaired by the legal obligation to reimburse county taxpayers for welfare payments of which he was totally unaware.

We are sympathetic to these concerns, but virtually all of them have been resolved to the contrary by the Supreme Court. (*In re Marriage of Comer*, *supra*, 14 Cal.4th 504.) First, as *Comer* recognizes, Carl had the use of the money for the many years in which he did not pay child support. Carl's heart may have been in the right place, but so was the public's, which laudably stepped forward to assist these children when they were in need. According to *Comer*, " '[t]here is thus a strong and manifest policy, obviously adopted for the benefit of the public, to the effect that a county which provides public assistance to a mother and children shall have the right to reimbursement from the primary obligor, the father.' " (*Id.* at p. 522.)

Second, the state has a legitimate interest in maximizing the benefit payments it can make to all needy children. Carl says that his children's interests must be the "single most important consideration" and that "ordering reimbursement in this case will take money away from the custodial parent and the children, money which would otherwise be used to support the children's present needs." The identical concerns were voiced by the father in *Comer*, but the Supreme Court gave determinative weight to "the important public policy favoring protection of the public fisc. . . . Thus, although father's contention that an order for welfare reimbursement 'is no benefit to [his] children' may be accurate in a technical sense, we decline to

---

[3]Specifically, section 11350 provides, "(a) In any case of separation or desertion of a parent or parents from a child or children which results in aid under this chapter being granted to that family, the noncustodial parent or parents shall be obligated to the county for an amount equal to the following: [¶] (1) The amount specified in an order for the support and maintenance of such family issued by a court of competent jurisdiction; or in the absence of such court order, the amount specified in paragraph (2). [¶] (2) The amount of support which would have been specified in an order for the support and maintenance of the family during the period of separation or desertion provided that any such amount in excess of the aid paid to the family shall not be retained by the county, but disbursed to the family. [¶] (3) The obligation shall be reduced by any amount actually paid by such parent directly to the custodian of the child or to the district attorney of the county in which the child is receiving aid during the period of separation or desertion for the support and maintenance of the family."

view the issue so narrowly, because reimbursement is intended to assist *other* families in need, just as prior orders in other cases undoubtedly helped ensure that [the county] had sufficient funds to provide public assistance to father's children." (14 Cal.4th at pp. 527-528; see also *Clark* v. *Superior Court, supra,* 62 Cal.App.4th at p. 580, fn. 3 ["Even here, however, the aim is still to keep welfare costs down for the sake of the taxpayers."].)

Third, Carl failed to avail himself of the resource most strongly pressed by the Supreme Court in *Comer*: the California Parent Locator Service. (*In re Marriage of Comer, supra,* 14 Cal.4th at p. 526 ["A noncustodial parent who is unable to locate the custodial parent and the couple's child (or children) is not without recourse. . . . [T]he noncustodial parent in such difficult circumstances 'may, for example, make use of the services of the district attorney and the California Parent Locator Service in an attempt to locate the missing parent.' "]; see also *In re Marriage of Walters* (1997) 59 Cal.App.4th 998, 1006 [70 Cal.Rptr.2d 354] ["Having failed to make any direct request to the district attorney for assistance in locating his daughter, appellant cannot now complain that county failed to provide that assistance"].)

Fourth and last, *Comer* refuses to impose upon public entities a duty to find absent parents. In *Comer* the father argued, as does Carl here, that the county should have made " 'a few simple efforts' " and looked more closely to find him rather than relying on the mother's " 'false' assertions" that he could not be located. (14 Cal.4th at p. 525.)

But mere governmental inaction or delay, according to *Comer*, does not suffice for estoppel. (14 Cal.4th at p. 525 ["father may [not] be released from his obligation to reimburse the county for public assistance payments made to his children on his behalf, based upon . . . the county's failure to act with diligence in attempting to locate him"].) *Comer* instead applied the statutory presumption that the government properly performed its official duties in acting upon the mother's welfare application and in seeking to locate the father. (*Id.* at pp. 525-526, citing Evid. Code, § 664.) Without a positive showing of malfeasance by the government, the court refused to let absent parents off the hook. (14 Cal.4th at p. 525; *County of San Bernardino* v. *Martinez* (1996) 51 Cal.App.4th 600, 605 [59 Cal.Rptr.2d 142] ["the child's abandonment of a parent [without just cause] now relieves the parent of the obligation for support *except* when the support is furnished by a governmental entity"].) To this point, then, Carl and similarly situated parents must foot the bill per *Comer*.

B

While Carl cannot predicate an estoppel upon mere inaction by the government, that does not end the matter. For there was more than a passive

failure to locate Carl. In sharp contrast with *Comer,* the record is replete with evidence suggesting the government "was derelict in its duty," thereby rebutting the presumption of official duty regularly performed. (*In re Marriage of Comer, supra,* 14 Cal.4th at p. 526.)

 There is a higher standard for estoppel against a public entity. In addition to all the elements for estoppel against a private party, "in the considered view of the court of equity, the injustice which would result from a failure to uphold an estoppel [must be] of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 496-497 [91 Cal.Rptr. 23, 476 P.2d 423].) Plainly stated, in the equitable estoppel balancing process, justice and right to the individual must outweigh the negative impact upon the public. Estoppel will not stand against a government agency " 'if the result will be the frustration of a strong public policy.' " (*In re Monigold* (1988) 205 Cal.App.3d 1224, 1228 [253 Cal.Rptr. 120].)[4]

In *Mansell* the Supreme Court applied estoppel to prevent public entities from asserting paramount title to public tidelands as against purchasers who bought in reliance on city action. In *Lentz* v. *McMahon* (1989) 49 Cal.3d 393 [261 Cal.Rptr. 310, 777 P.2d 83], the court recognized estoppel as a defense where the government itself was responsible for welfare overpayments; "[w]elfare department workers, who purport to advise and direct recipients, clearly stand in a confidential relationship to them." (*Id.* at p. 401.)

In *In re Monigold, supra,* 205 Cal.App.3d 1224, we estopped the state from postponing a prisoner's minimum eligible parole date based upon his participation in a worktime credit program for more than four years with the express understanding that such participation would guarantee him an earlier parole hearing. While the state had true knowledge of the facts, it nonetheless made false representations to the prisoner regarding his parole eligibility. Given these " 'affirmative representations, as opposed to mere silence or acquiescence, knowledge of the true facts will be imputed to one who, in the circumstances of the case, ought to have such knowledge.' " (*Id.* at p. 1228, fn. 3, citing *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at p. 491.)

Even *Comer* recognized that an estoppel may exist where there is " ' "some affirmative representation or acts by the public agency or its

---

[4]To find an estoppel, the public entity must have misrepresented or concealed material facts with knowledge of the truth, and with an intent to induce the other party's act or reliance. Conversely, the other party must have been permissibly ignorant of the true facts, and must have been induced to act or rely on the public entity's statement or concealment. (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at p. 488.)

representatives inducing reliance by the claimant." ' " (*In re Marriage of Comer, supra,* 14 Cal.4th at p. 522.) The court fully acknowledged that such a presumption was a rebuttable one. The court stated "*In the absence of any evidence contained in the record on appeal* suggesting that Arizona was derelict in its duty, we decline to hold that the presumption of official duty regularly performed was rebutted." (*Id.* at p. 526, italics added.)

This, too, is a case of governmental misrepresentation and ensuing reliance. In August 1993, the county (through the district attorney) was positively informed that Carl had a mailbox in Sonoma County. Despite this information the county (through SSA) still reported to the juvenile court that Carl's whereabouts were "unknown" and there was "no possibility" that he could be found. We know the two entities were on speaking terms; SSA itself had made the referral to the district attorney only two months earlier. The same dismal scenario was repeated the following spring: virtually simultaneously with the district attorney's acquisition of Carl's *actual* street address, SSA submitted yet another supplemental report stating his whereabouts remained unknown.

The county has a constitutional responsibility to use due diligence to notify absent parents before depriving them of that "most basic of civil rights"—the care, custody, and companionship of their children. (*In re B.G.* (1974) 11 Cal.3d 679, 688-689 [114 Cal.Rptr. 444, 523 P.2d 244].) As the presumed father of Jennifer, Carla and Christina, Carl was entitled to custody of the children and, hence, notice and the opportunity to be heard at the dependency hearings. The right to be heard has " 'little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.' " (*In re Antonio F.* (1978) 78 Cal.App.3d 440, 448 [144 Cal.Rptr. 466].)[5]

Here, the absent parent search did not comport with due process requirements. There was a total absence of effort. County officials simply took the mother at her word that Carl was somewhere out of state and could not be located and "eschewed reasonable efforts to find [him] . . . ." (*In re B.G., supra,* 11 Cal.3d at p. 689.) They did not truthfully and accurately inform the dependency court that a " 'thorough, systematic investigation and inquiry [has been] conducted in good faith' " to locate Carl, the absent father. (*David*

---

[5]Carl fully met the criteria of a presumed father; he married Denise, the children's mother, after their birth and was named as the father on each child's birth certificate. He also received each child into his home and openly held himself out as the father. (Fam. Code, § 7611, subds. (c), (d); *In re Zacharia D.* (1993) 6 Cal.4th 435, 449 [24 Cal.Rptr.2d 751, 862 P.2d 751].) Given Carl's status, we are at a loss to understand why SSA itself did not use the California Parent Locator Service and the services of the district attorney. (See *In re Marriage of Comer, supra,* 14 Cal.4th at p. 526.)

*B. v. Superior Court* (1994) 21 Cal.App.4th 1010, 1016 [26 Cal.Rptr.2d 586].) Since the district attorney had actual knowledge of his mailing address, "the search efforts undertaken [in the dependency proceedings] were woefully deficient and a finding of 'reasonable diligence' is wholly unsupportable." (*Ibid.*)

We do not go so far as does Carl in suggesting the county intentionally concealed his whereabouts in order to make money. The record does not in any way indicate such an intention. To the contrary, the social service reports show the county's openness to reunifying the children with Carl. But proof of concealment is not necessary; neither actual fraud nor an intent to mislead is an essential element to an estoppel against a public entity. (*John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 445 [256 Cal.Rptr. 766, 769 P.2d 948].)

If anything, this case demonstrates an all-too-commonplace situation where the county's left hand (SSA) did not know what its right hand (the family support division of the district attorney's office) was doing. SSA made the referral to the district attorney for reimbursement of public assistance benefits, and the district attorney filed a complaint on the county's behalf and in the county's name. (Welf. & Inst. Code, § 11350.1, subd. (a).) In this regard the district attorney was acting in his capacity as the law officer of the county, and not otherwise, and his knowledge is imputed to the county in light of the circumstances. (*Pitts v. County of Kern* (1998) 17 Cal.4th 340, 359 [70 Cal.Rptr.2d 823, 949 P.2d 920]; *In re Monigold, supra*, 205 Cal.App.3d at p. 1228, fn. 3; cf. *People v. Sims* (1982) 32 Cal.3d 468 [186 Cal.Rptr. 77, 651 P.2d 321].) We accordingly consider the collective conduct of both agencies which are so identified in interest that they represent the same legal right. (See *City of Long Beach v. Mansell, supra*, 3 Cal.3d at p. 491; *People v. Department of Housing & Community Dev.* (1975) 45 Cal.App.3d 185, 199 [119 Cal.Rptr. 266].)

The elements of reliance and prejudice are manifest. The children remained in the control of the state and on the public dole solely because the state was remiss in its obvious obligation to notify the one individual—the father—who had the right and the ability to care for them. Governmental benefits to Carl ceased when he was notified of the dependency proceedings, thereby permitting him to gain lawful custody of the children. It is a virtual certainty that the county would not have incurred the arrearages from March 1994 until mid-December 1995 had these misrepresentations not been made.

Ordinarily, the existence of an estoppel is a "question of fact for the trial court whose determination is conclusive on appeal unless the opposite conclusion is the only one that can be reasonably drawn from the evidence."

(*Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].) ▇ The instant case presents one of those unusual situations is which estoppel becomes a question of law because the uncontroverted evidence in the declarations permits only one inference: The government fell far short of the standard of " 'rectangular rectitude' " required in dealing with its citizens. (*Title Ins. Co.* v. *State Bd. of Equalization* (1992) 4 Cal.4th 715, 730 [14 Cal.Rptr.2d 822, 842 P.2d 121].)

No injustice will result from application of an estoppel. There will be little if any impact upon the public interest in reimbursing counties for public assistance benefits expended on behalf of children of absent fathers. Counties already have a constitutional obligation to give notice of dependency proceedings to presumed fathers. The county's failure to provide the father with his due notice resulted in the prolongation of foster care and the ensuing welfare payments.

The judgment is reversed. Defendant shall recover his costs on appeal in an amount to be determined in the discretion of the superior court upon return of the remittitur. (Code Civ. Proc., § 1021.5; Cal. Rules of Court, rule 26(a)(4); see *County of San Diego* v. *Lamb* (1998) 63 Cal.App.4th 845, 852 [73 Cal.Rptr.2d 912].)

Rylaarsdam, J., and Bedsworth, J., concurred.

On December 17, 1999, the opinion was modified to read as printed above.