[No. B156286. Second Dist., Div. One. Sept. 25, 2002.]

In re MEGAN P., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Plaintiff and Respondent, v.
VINCENT S., Defendant and Appellant.

[No. B158906. Second Dist., Div. One. Sept. 25, 2002.]

In re VINCENT S. on Habeas Corpus.

Tyna Thall Orren, under appointment by the Court of Appeal, for Defendant and Appellant.

Lloyd W. Pellman, County Counsel, and Arezoo Pichvai, Associate County Counsel, for Plaintiff and Respondent.

## OPINION

**VOGEL (MIRIAM A.), J.**—Following their mother's arrest in late 1996, four young girls were placed in foster homes. By July 1997, the Los Angeles County Department of Children and Family Services knew that the girls'

father (Vincent Edward *Scroghan*) was living in Indiana, and should have known that (since 1996) Vincent had been (and still is) sending child support payments for the girls to the Los Angeles County District Attorney's Bureau of Family Support Operations (now the Los Angeles County Child Support Services Department). But the left hand didn't know what the right hand was doing or how to spell. For about two years, the Department searched lackadaisically for Vincent *Scriggab*, and sometimes Vincent *Scriggag*, in California and only California. In 1998, when the dependency court noticed the spelling error, no light bulbs flashed over the Department's head, no one thought to check the file for other errors, and no one looked for Vincent *Scroghan* in Indiana. No one contacted Child Support Services.

It was not until March 2001 that the Department finally did the obvious— it sent a request for information to the "Parent Locator Clerk" at Child Support Services, who responded promptly with Vincent's address—the same one at which he had been receiving mail since 1996. Finally, the Department wrote to Vincent, asking in a form letter that he call to discuss "plans for his child." He called immediately, explaining that he had tried unsuccessfully to find his children and believed they were living with their mother. It was too late. The children, of course, had not been standing still— following multiple placements in too many foster homes, the oldest daughter was placed in a group home, the other three with prospective adoptive families. In Vincent's absence, his parental rights were terminated with regard to two of his daughters and a hearing was set for January 2002 to terminate his rights as to the third daughter. In December 2001, a lawyer was appointed to represent Vincent.

At the January 2002 hearing, Vincent's lawyer asked for a continuance, explaining that he had not had an opportunity to consult with his client. The request was denied and Vincent's rights were terminated. He appeals, and he has also filed a petition for a writ of habeas corpus, claiming he had no notice of the dependency court proceedings. Without a blush or even a wince, the Department contends here, as it did in the dependency court, that its search for the wrong man in the wrong state was legally sufficient. It was not. We find the Department's conduct inexcusable and so very, very sad under these circumstances. Had the Department sent a one-page request for information to the District Attorney's Bureau of Family Support Operations back in 1997, Vincent might have been able to offer a home to some or all of these children. At a minimum, he would have had a timely opportunity to be heard, and the girls (and the three adoptive families) would have been allowed to get on with their lives. As it stands, all Vincent wants is an opportunity to be heard with regard to his rights vis-à-vis the two girls who have not yet been adopted. He is entitled to that much.

## FACTS

Joyce P. met and began living with Vincent *Scroghan* in Indianapolis, Indiana.[1] In 1989, in Indiana, Joyce gave birth to her oldest daughter, Ashley P. Although it is not clear whether Vincent is Ashley's biological father, he has always treated her as his own child and (until he recently learned otherwise) has believed he was identified as her father on her birth certificate. In September 1990, in Indianapolis, Joyce gave birth to Megan P., who is Vincent's biological daughter. Once again (and until he recently learned otherwise), Vincent thought he was identified as Megan's father on her birth certificate and he has always treated her as his child. From 1989 until 1991, Joyce, Vincent, and their daughters lived at 1325 Philips Drive, Indianapolis, Indiana, in a house owned by Vincent's mother.

In 1991, Joyce, Vincent, Ashley, and Megan moved to Los Angeles, California, where Ashley's and Megan's sisters (Miranda P. and Mary P.) were born in 1991 and 1994. Miranda's and Mary's California birth certificates identify the girls' father as Vincent *Scroghan.* From 1992 to 1995, Joyce, Vincent, and their daughters lived together part of the time in California, and part of the time in Indiana at the Philips Drive house. In 1995, while in California, Vincent's relationship with Joyce ended and he returned to Indianapolis in the fall of that year. He wrote several letters to Joyce at the address where they had last lived but his letters were all returned. He tried to call Joyce's aunt (Mary A.) but was unable to reach her.

## 1996

On November 4, 1996, Joyce and her live-in boyfriend (Felipe L.) were arrested when they attempted to cash a forged check. On November 5, Ashley, Megan, Miranda, and Mary were detained by the Department of Children and Family Services. On November 7, a petition was filed in which the Department alleged that Joyce was unable to care for her children because she was in jail and because she had a history of drug and alcohol abuse, and that Joyce's boyfriend had other problems. The petition alleged that the whereabouts of the girls' father, "Vincent *Scriggag,*" were unknown, and that he was not providing them with regular care.

Meanwhile, Vincent continued his attempts to contact Joyce (directly and through her aunt) but he was unable to find her. The last time he tried to call Joyce's aunt, he learned that the aunt's telephone had been disconnected. At

---

[1] Throughout this opinion, Vincent's last name appears in bold italics. If the name is within quotation marks, the emphasis is ours. The issue on this appeal makes it impossible to reduce Vincent's last name to an initial.

the same time, the Child Support Services Division of the Los Angeles County District Attorney's Bureau of Family Support Operations was able to find Vincent at his mother's house on Philips Drive in Indianapolis, where Child Support Services wrote to him to demand that he pay child support for his daughters.[2] He readily admitted he was their father and began to make monthly support payments. When he was unemployed and was unable to make payments, his subsequent wages were garnished from time to time, and Child Support Services has over the intervening years regularly contacted Vincent by mail at the Philips Drive address.[3]

## 1997

A social worker's "declaration of due diligence" executed in February 1997 told the dependency court that a California records search for "Vincent *Scriggab*" had been unsuccessful, and that the whereabouts of the girls' father, "Vincent *Scriggag*," remained unknown. Although a report submitted to the court with the social worker's declaration shows that Joyce's aunt had told the social worker that the girls' "father [was] living somewhere in Indiana," there is nothing in the record to suggest that any effort of any kind was made to locate Vincent *Scroghan*—or even Vincent *Scriggab* or *Scriggag*—in Indiana. No one asked Child Support Services whether it had any information about Vincent. In April, the dependency court treated Vincent's failure to appear as a default and, in his absence, sustained the petition.

In July, the Department reported that the whereabouts of Vincent *Scriggag* remained unknown. In the same report, the Department noted that it had obtained Miranda's and Mary's birth certificates and provided the court with copies (but offered no explanation for why it took almost a year to obtain two California birth certificates). And although the birth certificates clearly identify Miranda's and Mary's father as "Vincent Edward *Scroghan*" (Miranda) and "Vincent E. *Scroghan*" (Mary), there is nothing in the record to suggest that the Department made any effort of any kind to locate Vincent under his true name—in California or in Indiana. In November, reunification services were ordered for Vincent *Scriggag.*

---

[2]On July 1, 2001, the Los Angeles County Board of Supervisors created the Los Angeles County Child Support Services Department to administer the child support program previously run by the Bureau of Family Support Operations as part of the District Attorney's Office. (See <http://childsupport.co.la.ca.us> [as of Sept. 3, 2002].) Unless the context suggests otherwise, our references to Child Support Services include the Bureau and the current entity.

[3]The record includes copies of several billing statements by Child Support Services sent to (and received by) Vincent at the Philips Drive address, and Vincent's appellate counsel has made several attempts to obtain further information from Child Support Services. She has received no response. As a result, there is nothing in the record to explain what Child Support Services has done with the money it has collected from Vincent between 1996, when the children were taken from Joyce's custody, and now.

**1998**

In May 1998, the Department reported that the whereabouts of the father, Vincent *Scriggab,* remained unknown. The same report states that a relative (Veronica M.) had told a social worker that Vincent lived in Indiana but that record searches in both California and Indiana for Vincent *Scriggab* had been unsuccessful. No one asked Child Support Services whether it had any information about Vincent, and no effort at all was made to find Vincent *Scroghan.* At a November hearing, there was the following exchange:

"THE COURT: There is a due diligence report for Vincent *Scriggans* (phonetic)? Who is he alleged—

"[JOYCE]: He is Megan and Miranda's father. . . ."

"[JOYCE'S LAWYER]: For the record, his name is *Scroggin.*

"THE COURT: How is it spelled?

"[JOYCE'S LAWYER]: *S-c-r-o-g-g-i-n.*

"THE COURT: *S-c-r-o-g-g-i-n-s*?

"[JOYCE]: No. Just *a-n*.

"[JOYCE'S LAWYER]: Oh. *a-n*.

"THE COURT: *S-c-r-o-g-g-a-n*?

"[JOYCE]: Right.

"[JOYCE'S LAWYER]: Yes."

The court ordered the Department to conduct a new "due diligence" search for Vincent *Scroggan,* and to give notice by publication if those efforts were unsuccessful.

**1999**

In a report prepared for a February 4, 1999, hearing, the Department stated that its search for Vincent *Scroghan* was pending. At the hearing, there was the following exchange:

"THE COURT: What's the father's name of the first three minors? Is it *Scroggan* or *Scroghan*?

"[JOYCE'S LAWYER]: I believe it is *Scroggan.*

"THE COURT: The minute order says *Scriggag,* with lots of G's. And then we got *Scroghan* with an H, and then *Scroggan* with two G's. [¶] And it just struck me as really funny when I saw it is *S-C-R-O G-H-A-N*. Okay? That's from the . . . birth certificate. . . . There was no notice to this father. I don't see it still. I mean, there is notice to . . . the mother . . . and every lawyer in the building. . . . [¶] I'm looking right at it. It says notice has not been given to the *Scroggan* father as required by law . . . ."[4]

The hearing was continued to April. For that hearing, the Department reported (1) that Vincent *Scroghan* lived at "645 Col De Cedros #68" in Los Angeles; (2) that (for reasons unexplained) the social worker was still waiting for Ashley's and Megan's birth certificates (which apparently were first requested in January 1999); and (3) that "Vincent **Schrogan**" had not responded to the social worker's contact letter, telegram, or notice of court hearing (all sent to the Col De Cedros address in Los Angeles).[5] Among the exhibits to this report are (1) a request to the California Department of Motor Vehicles (DMV) for information about "Vincent E. *Scroghan*"; (2) a response from DMV showing that a California Identification Card had been issued to "Vincent Edward *Scrogham*" on February 4, 1994 (notwithstanding that his application is in the name of "Vincent Edward *Scroghan*"), at which time Vincent resided at the Col de Cedros address in Los Angeles but continued to hold a valid Indiana driver's license;[6] and (3) a form due diligence declaration stating that the Department had, to no avail, searched *in California* for "Vincent E. *Scroghan*" by requesting information from the Los Angeles County Sheriff's Department, the Registrar of Voters, the Postmaster, the jails, and the prisons.

Although no request for information had been submitted to Child Support Services, and although no effort had been made to locate Vincent *Scroghan* in Indiana, the dependency court found that the Department had made a sufficient effort to locate Vincent and that notice had been sent to his last known address.[7] Reunification services were terminated, and an order excusing further service was made on the ground that Vincent's whereabouts were

[4]Until February 1999, every minute order identifies Vincent as "Vincent *Scriggag*."

[5]Although a social worker visited the Col De Cedros address and was told by neighbors that Vincent no longer lived there, the Department continued to send mail to that address.

[6]Although DMV's 1999 report to the Department included this information about Vincent's Indiana driver's license (and the number of that license), two more years went by before the Department searched for Vincent *Scroghan* in Indiana.

[7]By this time, the Legislature had created the California Parent Locator Service and Central Registry. (Fam. Code, § 17506, added by Stats. 1999, ch. 478, § 1.) We do not know when the statewide system became operational—but we do know that the Los Angeles County District Attorney's Office has had Vincent's address since 1996 and could have given that address to the Department. (See *In re Marriage of Damico* (1994) 7 Cal.4th 673, 691-692 [29 Cal.Rptr.2d 787, 872 P.2d 126] (dis. opn. of Baxter, J.); *In re Marriage of Comer* (1996) 14

unknown. Notice by publication was ordered, and later published in Los Angeles—but not in Indiana. In August, the court found the notice required by law had been given by publication.

## 2000

In April 2000, the dependency court found that adoptive homes had been identified for Miranda and Mary and that they were likely to be adopted, and terminated Vincent's (and Joyce's) parental rights as to Miranda and Mary. During this same year, Child Support Services was in regular contact with Vincent in Indiana (by receiving his checks or, when they didn't arrive, by garnishing his subsequent wages). But the Department made no further effort to find Vincent.

## 2001

In February 2001, the Department identified an adoptive home for Megan. In March, in anticipation of adoption proceedings, a further effort was made to locate Vincent—and a request was finally submitted to the Child Support Services' "Parent Locator Clerk"—who of course provided Vincent's address in Indiana. And, finally, an "Address Information Request" was sent by the Department to the Indiana Postmaster (the Department's request shows Vincent's address as 1325 Philips Drive, Indianapolis). Along with the request to the Postmaster, the Department sent a form letter in which it asked Vincent to contact the social worker to discuss "plans for [his] child." On April 4, the Postmaster reported, not surprisingly, that the letter had been delivered to Vincent at the Philips Drive address.

*Two days later, Vincent called the social worker.* He said he had received the letter and that he wanted custody of Megan. When the social worker (Tai Hong) asked Vincent why he had waited so long to contact the Department, Vincent said he believed the children were with their mother. The social worker told Vincent he would send notice of a scheduled July hearing. The notice was sent by certified mail and received by Vincent (as were all notices thereafter sent by the Department and the court). At that time, Vincent was unemployed and unable to travel to California.

At the July hearing, the court found that although notice of the hearing had been sent to Vincent *Scroghan* by certified mail, there had been no notice by mail or publication to the "identity-unknown father." The matter

Cal.4th 504, 526-527 [59 Cal.Rptr.2d 155, 927 P.2d 265] [discussing the District Attorney's obligation to collect child support and to locate missing parents]; *State of Washington ex rel. Burton v. Leyser* (1987) 196 Cal.App.3d 451, 459 [241 Cal.Rptr. 812].)

was continued to September, then to November, then to December 5. No one contacted Vincent, but the Department apparently believed it was Vincent who should have taken the initiative—because it reported in November (in a negative and critical tone) that Vincent had not visited Megan. Megan, meanwhile, was living with her prospective adoptive parents. On December 5, the court informed those present that Vincent's wife (Jessica Scroghan) had called the week before to say that Vincent wanted to have a lawyer appointed to represent him.[8] A lawyer (Robert Devine) was appointed to represent Vincent, and the hearing was continued to give Mr. Devine an opportunity to consult with his client. The court gave Vincent's address to Mr. Devine.

## 2002

In a report prepared for a January 2002 hearing, the social worker recommended termination of Vincent's parental rights so that Megan could be adopted—because Vincent was not listed on Megan's birth certificate, because he had no significant relationship with the child, and because his whereabouts were unknown from the inception of the case in November 1996 until about April 2001. At a hearing held on January 31, Vincent's lawyer told the court he had written to Vincent but had not received a response, and he requested a continuance to "allow [Vincent] an opportunity to see if he is able to come to California to address the court. . . ."[9] The court denied the request for a continuance, found that Vincent had received sufficient notice of the hearing, that Vincent was only an "alleged father," and that Megan was likely to be adopted. The parental rights of "alleged father Vincent E. *Scroghan*" were terminated. (Welf. & Inst. Code, § 366.26.)[10]

Vincent appeals, and he also petitions for habeas corpus relief.[11]

---

[8]Vincent and Jessica met in 1996, in Indiana, and were married in 1997. They now have two children (A., who is four, and E., who is three).

[9]In separate declarations filed in support of Vincent's habeas corpus petition, Vincent and Jessica both state that Vincent never heard from Mr. Devine, and that the last communication from anyone involved with his children or this case before Vincent was contacted by appellate counsel was the notice he received from the court about the January 31, 2002, hearing. Since Vincent acknowledges receipt of every communication sent by the Department and the Court, it seems likely that he did not receive any letter from Mr. Devine.

[10]Vincent is now employed full time in Indianapolis. He and Jessica are ready and able to care for Megan and Ashley, and would welcome them into their family. They would also "welcome an investigation of [their] home by any appropriate children's services agency."

[11]Although the Department has filed opposition to the petition, it has not offered any evidence of any kind to dispute the evidence submitted by Vincent in support of his habeas petition. As a result, the facts stated in this opinion are undisputed.

## DISCUSSION

By July 1997 (when the Department obtained Mary's and Miranda's birth certificates) the Department knew Vincent's last name and it had been told that Vincent was living in Indiana. The Department nevertheless continued to search for Vincent in the wrong state, using the wrong name, and it did not ask its sister agency (Child Support Services) whether it happened to know Vincent's whereabouts. In 1998, when the court discovered the spelling mistake and ordered a renewed search for Vincent using his correct name, the Department again ignored reports that Vincent was living in Indiana and searched for him only in California. The most obvious source—Child Support Services—was ignored, and it was not until April 2001, on the eve of the hearing set to terminate Vincent's parental rights and to free Megan for adoption, that the Department finally searched for the right person in the right place—and, as a result, finally found Vincent. In spite of all this, Vincent's request for a continuance (through appointed counsel who had not had an opportunity to consult with his client) was denied.

■ To state these facts is to demonstrate both the Department's incremental ineptitude and the reason for our reversal, and we see no need to say much more. (*In re Arlyne A.* (2000) 85 Cal.App.4th 591, 598-600 [102 Cal.Rptr.2d 109] [the term "reasonable diligence" denotes a thorough, systematic investigation and an inquiry conducted in good faith]; *County of Orange v. Carl D.* (1999) 76 Cal.App.4th 429, 439 [90 Cal.Rptr.2d 440] [before parental rights can be terminated, the Department has a constitutional obligation to exercise due diligence to notify the parent of the pending proceedings]; *In re B.G.* (1974) 11 Cal.3d 679, 688-689 [114 Cal.Rptr. 444, 523 P.2d 244]; *In re DeJohn B.* (2000) 84 Cal.App.4th 100, 109-110 [100 Cal.Rptr.2d 649]; *In re Melinda J.* (1991) 234 Cal.App.3d 1413, 1418 [286 Cal.Rptr. 239]; cf. *Nelson v. Superior Court* (2001) 89 Cal.App.4th 565, 574-575 [107 Cal.Rptr.2d 469].)

Vincent is aware that it is too late to salvage his relationship with Miranda and Mary without disrupting their lives with their adoptive parents, and he understands that Megan is living with people who want to adopt her. He simply wants to be heard, and to demonstrate to the court, if he can, that it is in Megan's best interests to get to know her biological father.[12] He is entitled to that much—and future dependent families are entitled to an

---

[12]Earlier this year, Vincent was told by Ashley's social worker (Mike Borboa) that she had been asking about him, and that Ashley's counselor wanted to explore the possibility of re-establishing the relationship between Ashley and Vincent. Borboa told Vincent that Ashley (who is now 13) was at the Maryvale Group Home, and Borboa gave Vincent the name and phone number of a Maryvale social worker. When Vincent finally reached the Maryvale social worker (who was difficult to reach), she said there was no one named Ashley P. at

assurance that the Department will examine its procedures and take steps to ensure that Child Support Services is contacted whenever a parent is missing, and contacted again at reasonable intervals until the parent is located or the case is closed, so that this issue will not arise in the future.

## DISPOSITION

The January 31, 2002, order terminating Vincent's parental rights and freeing Megan for adoption is reversed, and the cause is remanded to the dependency court with directions (1) to vacate the November 12, 1997, disposition orders as to Megan, and all subsequent orders affecting Megan, and to conduct those proceedings anew after providing proper notice to Vincent and an opportunity for him to be heard; (2) to determine Vincent's status vis-à-vis Ashley and, if it is in Ashley's best interests, to authorize visitation; and (3) to order the Department to provide all appropriate reunification services to Vincent. The petition for a writ of habeas corpus is granted to the extent necessary to vest jurisdiction in the dependency court to make the appropriate orders with regard to Megan and Ashley.

Ortega, J., concurred. Spencer, P. J., concurred in the judgment only.

---

Maryvale and that she had never heard of Ashley. Vincent attempted throughout June, July, and August of this of this year to contact Borboa to find out what is going on, but Borboa did not respond to Vincent's messages until the end of August, at which time Borboa asked Vincent to write a letter to Ashley, which Vincent said he would do. According to a report prepared by Borboa on August 25, 2002, Ashley (who is in fact living at the Maryvale Group Home) wants to talk to Vincent. For the record, Vincent had previously (in June) written letters to both Ashley and Megan, enclosed pictures of himself, his wife, and his two youngest daughters, and sent them to his appellate lawyer (Tyna Thall Orren) with the hope that she could get them to Ashley and Megan. Ms. Orren sent the letters to the girls' lawyers (Darold M. Shirwo, who represents Ashley, and Murray S. Berns, who represents Megan), but neither has acknowledged receipt or otherwise responded to Ms. Orren. On remand, Vincent is entitled to a determination of his status vis-à-vis Ashley, and to a determination by the court whether it is in Ashley's best interest to speak to and meet Vincent.