Filed 12/18/15  In re Jeremy B. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re JEREMY B., Jr., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, | F071458 |
| Plaintiff and Respondent, | (Super. Ct. No. 516952) |
| v. | **OPINION** |
| JEREMY B., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Caitlin U. Christian, under appointment by the Court of Appeal, for Defendant and Appellant.

John P. Doering, County Counsel, and Carrie M. Stephens, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Jeremy B. (father), the presumed father of now 13-year-old Jeremy B., Jr., appeals from the juvenile court's orders denying his petition for modification of an order, under

Welfare and Institutions Code section 388,[1] establishing guardianship with Jeremy's maternal aunt and uncle as Jeremy's permanent plan, and terminating dependency jurisdiction. Specifically, he challenges the juvenile court's finding made at the six-month review hearing that the Stanislaus County Community Services Agency (Agency) exercised due diligence in trying to locate and notify him of that hearing, arguing he was denied due process because the Agency failed to utilize reasonably available means that would have enabled it to locate him during the statutory period for reunification. We reject father's contention and affirm the juvenile court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

In January 2014, Jeremy, age 11, and his half siblings, 10-year-old Morgan and two-year-old Ronald,[2] (collectively the children) were living with their maternal grandfather, Larry B.

*Referral*

On January 22, 2014,[3] the children were taken into protective custody after social workers investigating a referral substantiated allegations of general neglect based, in part, on the condition of the children's home and Larry's use of controlled substances. Mother had a history of substance abuse and mental health issues, and her youngest child, David, who is the children's half brother, was the subject of a dependency proceeding in which mother's reunification services had been terminated and a section 366.26 hearing set.

*Initial Attempts to Locate Father*

The Agency attempted to locate father. On January 22, the social worker submitted a request for an absent parent search for father; the results, which were

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Jeremy, Morgan and Ronald have the same mother, S.B. (mother), but they each have different fathers. Morgan and Ronald are not the subjects of this appeal, which involves only Jeremy, and mother is not a party to it.

[3] Subsequent references to dates are to the year 2014, unless otherwise stated.

received the next day, reflected six possible addresses and two possible phone numbers.[4] On January 23, the social worker called the two phone numbers, but both were disconnected. The social worker then arranged for a driver clerk to deliver letters to father's three last known addresses and to mother's address to notify them of the court hearing. When delivering father's letters, the driver confirmed that one address was not valid and father did not live at another address. When the driver delivered mother's letter to her, mother told the driver that she knew where father was and offered to show the driver where he lived. Mother jumped in the car and guided the driver to an empty lot on a corner in Turlock, where she said father lived in a tent trailer. The driver left the letter on the front door of father's tent trailer. Mother told the driver that father did not have a mailing address.

*Dependency Petition*

On January 24, 2014, the Agency filed a dependency petition alleging the children came within the provisions of section 300, subdivisions (b) (failure to protect), (g) (no provision for support), and (j) (abuse of sibling). As to father, the petition alleged his whereabouts were unknown and therefore he was unable to provide support for Jeremy,

---

[4] The "Absent Parent Search Summary" dated January 23, 2014, showed that the following records were checked and results received: (1) the Stanislaus County Automated Welfare System, which listed an address on Broadway in Turlock; (2) the Department of Corrections Identification and Warrants Division, which stated that father was not incarcerated in a California state or federal prison; (3) the Stanislaus County Court System Case Locator, which listed addresses on Nunes Street and Marshall Street in Turlock; (4) the Stanislaus County Department of Child Support Services, which also listed the Broadway address; (5) an internet search of directories where father may have resided, which showed no matches for a "WHITE PAGE SEARCH"; (6) Stanislaus County jails, including women's, men's and the honor farm, which stated he was incarcerated from February 5 to 11, 2013, and his address was shown as "homeless"; (7) Medi-Cal Eligibility Data System (California counties search), which listed the Broadway address and a telephone number in the (209) area code; (8) "Accurint," which listed addresses on S. 9th St. in Modesto, and Morgan Rd. in Turlock; and (9) Stanislaus County Probation Department, which listed an address on S. 1st St. in Turlock, and another telephone number in the (209) area code.

and he had an extensive criminal history; his most recent arrest was in February 2013 for second degree burglary, and he had numerous arrests and convictions for theft, battery and possession of controlled substances. Father also had an extensive history of drug use.

Father did not appear for the January 27 detention hearing, at which the juvenile court ordered Jeremy detained. The children were placed together in a foster home. On February 4, the social worker mailed letters to relatives listed on a "Youth Connection List," which included one of father's relatives. On February 6, the paperwork for an "ICPC" was completed and submitted for an expedited home evaluation and assessment of a maternal aunt and uncle, Mr. and Mrs. B., who lived in Oregon. The B.'s had visited the children at the Agency on January 27.

*Further Attempts to Locate Father*

On February 7, the social worker mailed letters, along with father's referral form, to father at all of the addresses listed on the absent parent search; two of the letters were returned to the social worker. On February 20, the driver clerk attempted to deliver another letter to father at his last known location, the tent trailer, which included father's referral form, instructions for contacting the social worker and engaging in referrals, and the date of the next hearing. Upon arrival, the driver discovered that father's "alleged tent trailer" had been moved. The driver went to mother's residence and asked her about father's whereabouts; mother reported that police had towed the trailer and she did not know where father was. On February 21, the social worker resubmitted father's absent parent search to check for any new contact information, but no new information was returned.

*Jurisdictional/Disposition Hearing*

Neither mother nor father appeared at the March 3 combined jurisdictional and dispositional hearing. The juvenile court found that notice of the hearing was given properly and that the Agency exercised due diligence in attempting to locate and notify father. The juvenile court found the petition's allegations true and that the children were

persons described by section 300, subdivisions (b), (g) and (j); adjudged them dependents of the court; removed the children from parental custody; denied mother reunification services pursuant to section 361.5, subdivision (b)(10) based on her failure to address the issues that led to the termination of reunification services in David's case; denied father reunification services pursuant to section 361.5, subdivision (b)(1), as his whereabouts were unknown; found the Agency exercised due diligence in conducting its investigation to identify, locate and notify the children's relatives; noted that services would have been limited to a period of six months; authorized the Agency to place the children in Oregon as soon as the B.'s were approved for placement; and scheduled a six-month review hearing for August 21.

In a report prepared for the review hearing, the social worker stated that the children were placed in the B.'s home in Oregon in June 2014, where they were doing well. The B.'s were interested in providing the children permanency and stability.

*Further Attempts to Locate Father*

The social worker reported on the further efforts made to locate father. On July 11, the social worker requested an absent parent search for father.[5] On July 31, the social worker tried to contact father at the phone numbers listed on the absent parent search, but one phone number had an error message that the call could not be completed as dialed, and the man who answered at the second phone number said it was a wrong

---

[5] The "Absent Parent Search Summary" dated July 11, 2014, lists the same nine records that were previously checked. There were some different responses, however, as follows: (1) under Department of Corrections Identification and Warrants Division was stated "NO BOOKINGS"; (2) under the Stanislaus County Court System Case Locator, three additional addresses were listed, but those addresses were included under other records in the prior summary; (3) the internet search of the "WHITE PAGES" yielded seven results, which were not listed; (4) the S. Broadway address was listed under the Stanislaus County jails; (5) under "Accurint" a new address was listed on Claribel Road in Modesto, with the dates "SEP01-JUN14"; and (6) the Stanislaus County Probation Department listed a different address and unit letter on "S 1st Street" in Turlock, as well as a different phone number, and stated this was father's address.

number. On August 1, the social worker mailed letters to all the addresses listed on the July 14 absent parent search asking father to contact the social worker and notifying him of the upcoming hearing.

Since six months had elapsed and father's whereabouts remained unknown, the Agency recommended that a section 366.26 hearing be set to establish a permanent plan for the children. There is no proof of service showing the Agency attempted to provide father with the status review report.

*Six-Month Review Hearing*

Neither father nor mother appeared at the six-month review hearing held on August 21. The juvenile court found that notice of hearing had been given properly and the Agency exercised due diligence in attempting to locate and notify father. Given that the parents' whereabouts continued to remain unknown, the juvenile court set a section 366.26 hearing for December 22, to establish a permanent plan of guardianship with the B.'s. The juvenile court did not think the Agency had the parents' last known addresses to which to send writ advisements, so the juvenile court stated that advisements would not be sent unless their addresses become known. A proof of service stated that the court's minute order, as well as blank copies of the notice of intent to file a writ petition and petition for extraordinary writ, were mailed to father at five of the addresses the Agency previously had obtained.

*Father Located*

On September 19, an absent parent search was completed for father and he was located at the John Latorraca Correctional Facility in Merced County, where he had apparently been residing since April 2014. A notice of hearing was served on father at the jail.

On October 20, the Agency moved for appointment of counsel for father. Father had called the social worker from the jail on October 14; he stated he received notice of the December 22 permanency planning hearing, he was not aware the children were in

foster care, and he wanted an attorney appointed for him.  On October 22, the juvenile court granted the request, appointed an attorney, and ordered the Agency to immediately serve discovery.  The next day, the Agency served father and his counsel with discovery, including the dependency petition and the social workers' reports.

In a report prepared for the December section 366.26 hearing, the Agency recommended a permanent plan of legal guardianship for the children in the B.'s home and dismissal of dependency.  The children had been with the B.'s for six months and were doing well in their care.  Although father had come forward and made known that he wanted the opportunity to have Jeremy back in his care, he was incarcerated and his whereabouts were unknown for over six months.  Father had written three letters to Jeremy since receiving notice of the hearing, but Jeremy stated he was not ready to write father, or to have a relationship with either parent.  The children were stable and happy in their placement and the B.'s had done an excellent job meeting the children's needs and accessing resources for them.  The social worker opined that the children needed to move forward with permanency and stability, which the B.'s were offering.

Father appeared at the December 22 section 366.26 hearing, which the juvenile court continued to February 18, 2015, because notice of the hearing was not proper, as the wrong recommendation was listed on the notice.  Father's attorney objected to the lack of proper notice to father as to all of the hearings in the case.

*Father's Section 388 Petition*

On February 6, 2015, father filed a section 388 petition in which he asked the juvenile court to order reunification services for him and to convert the section 366.26 hearing to a review hearing.  Father stated circumstances had changed because he had been located, "albeit late because [of] the Agency's failure of due diligence to locate him earlier"; and his five-year sentence was likely to be reduced due to the passage of Proposition 47.  Father said it would be in Jeremy's best interest to offer him services, as he had a "close relationship" with Jeremy before his incarceration, and he knew the

7.

family's physical and mental health histories, which would assist Jeremy through adolescence.

In her declaration accompanying the petition, father's attorney alleged, on information and belief, that (1) father had been incarcerated in the Merced County jail, where he was serving a five-year sentence; (2) his deputy public defender would testify that she contacted the Stanislaus Probation Department in June 2014, and if the juvenile court granted father reunification services, the Merced County Superior Court may release him to a program; (3) in July 2014, father sent a "1381 Demand"[6] to the Stanislaus County District Attorney's Office, which was forwarded to the Stanislaus County Superior Court in September 2015; (4) the Stanislaus County Office of Child Support sent father a letter with a September date asking for payment for the month of August; (5) if Sophia Ahmad were called to testify, she would say that father was eligible to have one and possibly two of his prior convictions that affect his current sentence reduced to misdemeanors; and (6) father believed he had a good relationship with Jeremy and could help him through his adolescence.

In points and authorities, father's attorney asked the juvenile court to return the case to the dispositional hearing because the Agency did not make reasonable efforts to locate father. The attorney asserted that she learned from father that he was incarcerated in Merced County as of April 2014, he contacted his probation officer through his

---

[6]    The "1381 Demand" father sent is apparently a demand for trial made pursuant to Penal Code section 1381. That section provides, in relevant part, that a defendant must be brought to trial on pending criminal charges within 90 days after a written notice of the defendant's place of imprisonment and desire to be brought to trial is delivered to the district attorney of the county in which charges are pending, when the defendant has been convicted of a felony or misdemeanor in any state court and "has been sentenced to and has entered upon a term of imprisonment in a county jail for a period of more than 90 days or has been committed to and placed in a county jail for more than 90 days as a condition of probation ...." (Pen. Code, § 1381.) If the defendant is not brought to trial or sentenced within the 90–day period, the action must be dismissed on either the court's or an interested party's motion. (*Ibid.*)

defense attorney in Merced County in June 2014, and he filed a "1381 Demand" with the Stanislaus County District Attorney's Office in July 2014. The attorney argued that instead of merely doing an electronic records search, the Agency should have called Stanislaus County Probation in July, which would have revealed that father was incarcerated in Merced County and allowed him to appear at the six-month review hearing so he could exercise his right to ask for reunification services or, at the very least, exercise his right to file an extraordinary writ.

*Section 366.26 and Section 388 Hearing*

The juvenile court set a hearing on the section 388 petition for February 18, 2015 to coincide with the section 366.26 hearing. At the February 18 hearing, the juvenile court allowed Jeremy, who appeared by telephone, to make a statement. Jeremy told the court that he did not think father should get him because he did not trust father and he wanted to live in Oregon. Jeremy said that instead of visiting him and the rest of the family, father only tried to visit mother. The juvenile court continued both hearings to March 4, 2015.

The Agency then filed a report in opposition to the section 388 petition, in which it asserted it exercised due diligence in notifying father of the dispositional hearing and argued that the petition did not promote Jeremy's best interest. The Agency contended there was no evidence to suggest that father acted in a parental role to Jeremy or made any effort to protect him. Although the Agency had received numerous referrals concerning Jeremy since his birth, and the Agency provided the family with family maintenance services between February 2013 and January 2014, there was never any mention of father, other than that Jeremy had not seen him in a while and father was not allowed to be around due to drug use. It appeared that father had spent most of his adult life either engaged in criminal activity or behind bars due to theft and other drug-related charges.

9.

The Agency also pointed out that Jeremy had made it clear that he was opposed to father receiving reunification services, as he did not want to reunify with father or move from the B.'s home. Jeremy had stated that father had not acted as a parent, had made poor choices in his life, and had not tried to have a relationship with him. The Agency attached letters father had written to the juvenile court, which it asserted demonstrated that father had not been a figure in Jeremy's life. Although father was out of custody from the time Jeremy was taken into protective custody in January 2014 until his arrest in another county on theft-related charges on April 18, 2014, father had no apparent concern about Jeremy's whereabouts. Father acknowledged to the social worker that he in fact lived at the tent trailer at which the Agency served notice, but claimed he did not receive the notice.

The Agency stated that in all but one of father's letters, father maintained he was not able to see Jeremy because he was looking after his ailing father (the paternal grandfather) in Gustine. The Agency asserted that one letter showed the real reason father did not come forward. In that letter, father explained that he "kept a low profile" because he was taking care of the paternal grandfather *and* he had a previous warrant out of Turlock for theft. The Agency questioned why having a warrant out for his arrest would keep father from seeing Jeremy unless father knew the juvenile court was involved in Jeremy's life. The Agency further noted that while father believed he would be released to a drug treatment program if the petition were granted, there was no evidence that he otherwise would be released from custody.

The Agency contended that it had exercised due diligence to find father. The Agency explained that it requested another absent parent search on July 11, which did not reveal father's address at the Merced County jail. The Agency sent letters to the addresses listed on the search, and attempted to call the phone numbers listed there to no avail. The Agency asserted that it did not have access to another county's minute orders, and there was no evidence to support father's claim that the Stanislaus County Probation

Department knew father was in the Merced County jail and, even if it had, there was no evidence the Agency should have known to contact the probation department to ask if it had ever heard of father. While the Stanislaus County Department of Child Support Services may have found father sometime in July or August, there was no evidence that information was known to the Agency before the August 21 review hearing.

The Agency explained that it requested another absent parent search in preparation for the section 366.26 hearing, which revealed that father was incarcerated in Merced County. According to the legal clerk who completed the July 2014 absent parent search, and the legal clerk's supervisor, it is not protocol to search for parents in other county jails unless there is reason to believe they are in that county. The supervisor reported that it was likely child support services found father before the absent parent search was done for the section 366.26 hearing, which was how she discovered father was incarcerated in Merced. Once father received notice of the hearing, father's public defender contacted the social worker to tell her father was trying to reach the Agency regarding the notice. Shortly thereafter, the Agency submitted the motion requesting appointment of an attorney for father.

*Continued Section 366.26 and Section 388 Hearing*

At the March 4, 2015, hearing, the juvenile court first addressed the section 388 petition. The juvenile court read and considered father's petition as well as the Agency's opposition. The parties did not present any witnesses or additional evidence. The juvenile court asked Jeremy if he wanted to say anything. Jeremy asked the court if contact with father could be done only over the phone and through letters. Father's attorney argued that if the Agency had called probation, it would have located him by July, if not before, and certainly by the six-month review hearing, which would have given him a chance to participate in that hearing and exercise his right to file a writ.

County counsel cited to the arguments in the Agency's opposition, and added that it was impossible to look at the minute orders from all the counties for individuals

11.

sentenced on criminal matters. County counsel also asserted that father had notice, as the Agency provided it to father, but father did not want to participate "because he wanted to lay low to get out of custody," and he only submitted the petition to try to get into a treatment program so he could get out of custody. County counsel further argued that granting the petition was not in Jeremy's best interest, and the guardianship plan actually improved the possibility that father would have contact with Jeremy. Jeremy's attorney agreed with County counsel's argument.

The juvenile court stated it considered and carefully read father's letters that were attached to the Agency's opposition, as well as the documents attached to father's section 388 petition. The juvenile court noted that it previously found the Agency had exercised due diligence to attempt to contact father and notify him of the proceedings, and if father had the close relationship with Jeremy that he claimed, he should have, and would have, known that Jeremy was detained at some point reasonably soon after his detention. The juvenile court stated that the Agency "went above and beyond" its duty by going out to the river and posting a notice on a tent trailer. Accordingly, the juvenile court found that the Agency exercised due diligence to attempt to locate and notify father of the proceedings. The juvenile court noted that father indicated in one of his own letters that he "was laying low because he had an outstanding warrant," and while the court did not doubt father loved his son, the court felt father's real motivation for filing the section 388 petition was not so much to have services to reunify with Jeremy, but to be eligible for services so he could be released from jail. The juvenile court denied the petition, as it did not find there had been any significant change of circumstances and did not believe granting the section 388 petition would be in Jeremy's best interest.

The juvenile court then addressed the section 366.26 hearing. Father stated that he was fine with the Agency's recommendation of guardianship, but asked for in-person visits when he was out of custody and phone calls with Jeremy, and that the children be given their grandfather's phone number. The juvenile court ordered guardianship as the

permanent plan, appointed the B.'s to be the children's guardians, and dismissed dependency. With respect to visits with Jeremy, the juvenile court ordered that when father was incarcerated, visits would be by telephone and letters, and when not incarcerated, father was entitled to one, two-hour, supervised, face-to-face visit per month in Jeremy's county of residence.

## DISCUSSION

Instead of challenging the juvenile court's order denying his section 388 petition, father challenges the juvenile court's finding made at the August 21 six-month review hearing that the Agency exercised due diligence in attempting to locate him.[7] Father argues that the Agency was required to do more than run an absent parent search to try to locate him before the six-month review hearing, as there were "ample additional and reasonable means" the Agency could have utilized to find him. Father contends that the Agency's failure to follow up on the information it had and to use reasonably available means to locate him violated his due process rights. He asserts the lack of notice is structural error requiring automatic reversal, or alternatively, the error requires reversal because it cannot be deemed harmless. Father asks us to return the case to the dispositional phase so he can receive reunification services.

With respect to the Agency's efforts, father specifically contends the Agency should have: (1) followed up with law enforcement after learning police had towed the tent trailer; (2) asked mother if she had contact information for family members or friends who may have known father's whereabouts, or asked for assistance from relatives the Agency did contact; (3) called agencies that provide general relief or supplemental

---

[7] Father asserts he is entitled to seek review of the findings made at the six-month review hearing on his appeal from the findings and orders made at the section 366.26 hearing because he did not receive notice of the requirement for writ review, citing *In re T.W.* (2011) 197 Cal.App.4th 723, 730; *In re Frank R.* (2011) 192 Cal.App.4th 532, 539; *In re Lauren Z.* (2008) 158 Cal.App.4th 1102, 1110. The Agency apparently concedes that he may do so, as it does not contend otherwise.

13.

income; (4) enlisted the assistance of an investigator or local law enforcement agency; (5) tried to determine whether father was involved in the criminal justice system in neighboring counties, as father's prior phone numbers were in the 209 area code and he had prior convictions in Merced County,[8] by searching databases in Merced County; and (6) called the Stanislaus County District Attorney or the probation department. Father asserts that had the Agency done any of these things, it would have discovered his whereabouts before the six-month review hearing.

The Agency argues that its search for father was reasonable because it did more than run a computer search; it tried to locate father at the addresses listed on the search, asked mother about father's whereabouts, and left a notice on the tent trailer's door. The Agency asserts there is no credible evidence that a phone call to the probation department would have revealed that father was in jail in Merced County, it did not possess any information that would have led it to investigate whether father was in jail there, and there is no evidence that the district attorney's office was aware in July 2014 that father was in the Merced County jail or that any such knowledge could be imputed to the Agency. The Agency contends that, based on the information available to it, the absent parent search was a "reasonably diligent" search, and therefore the juvenile court's finding must be upheld.

---

[8] Father asserts that he had prior convictions in Stanislaus, Merced *and* San Joaquin counties. A review of father's criminal history that the Agency obtained from the California Law Enforcement Telecommunications System (CLETS) reveals, however, that his convictions were primarily in Stanislaus County. There are only two cases that reference arrests or convictions in Merced County: (1) in August 1998, he was arrested for possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)), but the CLETS history does not show a disposition for the case; and (2) in September 2005, he was arrested for, and pled guilty to, misdemeanor violations of reckless driving in a parking facility (Veh. Code, § 23103, subd. (b)) and driving without a license (Veh. Code, § 12500, subd. (a)), for which he received a fine. The history does not list any convictions in San Joaquin County; instead, the history lists parole violations which led to sentences in the state prison in Tracy.

14.

Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (*Mullane v. Central Hanover Bank & Trust Co.* (1950) 339 U.S. 306, 314; *In re Claudia S.* (2005) 131 Cal.App.4th 236, 247 (*Claudia S.*).) "Notice is both a constitutional and statutory imperative. In juvenile dependency proceedings, due process requires parents be given notice that is reasonably calculated to advise them an action is pending and afford them an opportunity to defend." (*In re Jasmine G.* (2005) 127 Cal.App.4th 1109, 1114.)

If a parent's whereabouts are unknown, the child welfare agency must act with diligence to locate the missing parent. Reasonable diligence "'denotes a thorough, systematic investigation and an inquiry conducted in good faith ….'" (*David B. v. Superior Court* (1994) 21 Cal.App.4th 1010, 1016 (*David B.*).) "Where the party conducting the investigation ignores the most likely means of finding the [parent], the service is invalid even if the affidavit of diligence is sufficient." (*Ibid.*) "However, there is no due process violation when there has been a good faith attempt to provide notice to a parent who is transient and whose whereabouts are unknown for the majority of the proceedings." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188 (*Justice P.*).) Thus, where a parent cannot be located notwithstanding a reasonable search effort, the failure to give actual notice will not render the proceedings invalid. (*Claudia S., supra,* 131 Cal.App.4th at p. 247.)

"'It is not always possible to litigate a dependency case with all parties present. The law recognizes this and requires only reasonable efforts to search for and notice missing parents. Where reasonable efforts have been made, a dependency case properly proceeds. If a missing parent later surfaces, it does not automatically follow that the best interests of the child will be promoted by going back to square one and relitigating the case. Children need stability and permanence in their lives, not protracted legal proceedings that prolong uncertainty for them. Further, the very nature of determining a

child's best interests calls for a case-by-case analysis, not a mechanical rule.'" (*In re J.H.* (2007) 158 Cal.App.4th 174, 182–183, quoting *Justice P., supra,* 123 Cal.App.4th at p. 191.)

We review a due process notice issue as a mixed question of law and fact in which we defer to the juvenile court's findings of historical fact under the substantial evidence standard of review and determine a due process violation under the de novo standard of review. (Cf. *People v. Alvarez* (1996) 14 Cal.4th 155, 182 [review of search and seizure issue]; see *In re J.H., supra,* 158 Cal.App.4th at p. 183 [constitutional issues reviewed de novo].)

Here, the Agency undertook a reasonably diligent search for father throughout these proceedings. It conducted searches of both government and Internet directories, some of which were statewide searches and others of local areas where father was known to have lived in the recent past. The Agency's search at the outset of the case yielded six different addresses in Stanislaus County – five in Turlock and one in Modesto. Father's last known incarceration was at the Stanislaus County jail, which listed his address as "homeless." The Agency, through its driver clerk, asked mother about father's whereabouts; mother said that while father did not have a mailing address, she knew where he was living and directed the driver to a tent trailer, which father later admitted was his residence, at which the driver left a notice of the detention hearing. After the driver discovered that the tent trailer was gone from its previous location, he checked with mother, who stated that police had towed the trailer and she did not know where father was. The Agency did not merely look at a computer to determine addresses, nor did it ignore the most likely source of information about father's whereabouts, namely mother. Moreover, the Agency physically searched to find a man presumed to be homeless.

When the six-month review hearing neared, the Agency conducted another absent parent search of government and Internet directories, which revealed two different

16.

addresses. The social worker called the phone numbers listed on the search results, to no avail, and mailed letters to all of the addresses listed on the search. This was not a situation like the cases upon which father relies, in which the social service agency ignored specific information in its possession about a parent's likely whereabouts. (See, e.g., *In re Arlyne A.* (2000) 85 Cal.App.4th 591 [social service agency did not exercise reasonable diligence in trying to locate a parent where it ignored timely information supplied by the minor's attorney and the maternal grandmother]; *David B.*, *supra*, 21 Cal.App.4th at p. 1016 [social service agency's efforts to locate a father were not reasonable where the minor's birth certificate revealed that the father was a United States Marine and the agency failed to ask the Marines about father's whereabouts].) Nor was it a situation where the Agency did nothing to attempt to locate father and notify him of the hearing, as in *In re DeJohn B.* (2000) 84 Cal.App.4th 100, 104, or simply presumed his whereabouts were unknown, as in *In re B. G.* (1974) 11 Cal.3d 679, 689.

Father asserts that because the Agency knew he had prior phone numbers in the 209 area code and had numerous convictions in San Joaquin, Stanislaus and Merced counties, it should have determined whether he was involved in the criminal justice system in San Joaquin and Merced counties. But father's premise is faulty, as his convictions were almost entirely in Stanislaus County. He had no convictions in San Joaquin County, but instead was committed to the state prison located there due to parole violations stemming from Stanislaus County cases, and he had only one conviction in Merced County in 2005, which resulted in a fine. The other record from Merced County shows an arrest in 1998. There was nothing from father's criminal history to suggest that father had recently committed crimes in Merced County that would have resulted in him being jailed there, and therefore his record did not provide information from which the Agency should have known to check databases in Merced County.

Father also asserts the Agency should have called the probation department or the Stanislaus County District Attorney, either of which could have provided the Agency

with father's location. His argument concerning the probation department is based on his claim that his Merced County public defender contacted that department in June 2014, before the July 11 absent parent search. That search, however, indicated that the probation department had a new address for father in Turlock. There is no credible evidence that a phone call to the probation department would have revealed that father was in jail in Merced County.

Neither is there credible evidence that a call to the Stanislaus County District Attorney would have revealed his whereabouts. This claim is based on father's assertion that he sent a "1381 Demand" to the district attorney's office in July 2014. But there is no evidence as to whether the demand was sent before or after the Agency conducted the absent parent search, how the district attorney's knowledge of father's location could be imputed to the Agency, or whether a phone call to the district attorney's office would have revealed father's location. As such, this case is distinguishable from *County of Orange v. Carl D.* (1999) 76 Cal.App.4th 429, 432, 439-440, in which the appellate court found an absent parent search did not comport with due process requirements where the county's district attorney had actual knowledge of father's mailing address, yet the social service agency reported to the juvenile court that the father's whereabouts were unknown, and the record showed the two agencies were on speaking terms, as the social service agency had made a referral to the district attorney's child support unit only two months earlier.

In sum, whether or not it would have been possible to make a more comprehensive search, the record shows that based on the information available to the Agency, it conducted a reasonable search to locate father and the inquiry was made in good faith. (*David B.*, *supra*, 21 Cal.App.4th at p. 1016.) Father has not shown that the Agency failed to make any meaningful effort to locate him. (See *In re Emily R.* (2000) 80 Cal.App.4th 1344, 1353 [father bears burden of showing search method would have

some chance of success].)  Therefore, the juvenile court did not err in declining to set aside its prior finding of due diligence.

## DISPOSITION

The juvenile court's orders are affirmed.

_____
FRANSON, Acting P.J.

WE CONCUR:


_____
PEÑA, J.


_____
SMITH, J.